IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN KAGARISE, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LISA CHRISTIE, et al., | : | No. 09-0402 |
| Defendants. | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                                 November 26, 2013

This § 1983 action involves claims of gender discrimination and retaliation brought by Plaintiff Steven Kagarise against fellow officers and supervisors of the Pennsylvania State Police. The defendants filed a motion for summary judgment. For the reasons set forth below, I will grant this motion.

### I. BACKGROUND

The plaintiff is a trooper with the Pennsylvania State Police who was assigned to Troop G McConnelsburg, Fulton County, Pennsylvania. (Compl. at ¶ 1). On March 4, 2009, he filed this complaint against Lisa Christie, Jeffrey Watson, Willard Oliphant, John Stchur, William Tucker, Gregory Bernard, Michael Patrick, Joseph Kovel, John Brown, Richard Bosch, and Stacy Gelvin.[1] On December 13, 2010, the parties stipulated

---

[1] The defendants in this case are numerous. Lisa Christie is a captain with the state police and was a disciplinary action officer. Jeffrey Watson is a captain and plaintiff's supervisor. Willard Oliphant is a captain and a supervisor in the internal affairs division. John Stchur, William Tucker, and Gregory Bernard are corporals and Internal Affairs Division (IAD) investigators. Michael Patrick is a lieutenant and an IAD supervisor. Joseph Kovel is a trooper and union representative. John Brown is a lieutenant colonel and an IAD supervisor. Richard Bosch is a sergeant and Mr. Kagarise's supervisor. Stacy Gelvin is a trooper. Compl. at ¶¶2-12.

to the dismissal of Ms. Gelvin. The complaint raises an Equal Protection claim and a First Amendment Retaliation claim.[2]

The plaintiff has been a trooper since 1991. (Doc. No. 48 at ¶ 3). During his employment, the plaintiff regularly objected to unwritten customs and policies, including quota systems that deprived troopers of their discretion in issuing citations. (Doc. No. 48 at ¶¶ 73-76; Compl. at ¶ 15). At one point, he notified the Pennsylvania State Troopers Association (PSTA) and complained of the quota systems being implemented. (Doc. No. 48 at ¶¶ 75-76). He also reported his supervisors and others for misconduct, including sexual harassment. (Doc. No. 48 at ¶ 4; Compl. at ¶ 15). For instance, the plaintiff's report that Corporal Greg Edgin had sexually harassed a female officer resulted in Edgin's termination. (Doc. No. 48 at ¶¶ 4).

In 2006, Ms. Gelvin, his co-worker, was interviewed by the Internal Affairs Division (IAD) concerning an investigation of some "sexual emails" sent by two other officers. (Doc. No. 48 at ¶ 10). During the investigation, Gelvin also alleged that she had

---

[2] The complaint alleges what appears to be a conspiracy claim stating that: "Plaintiff submits that all Defendants are liable for the violations of Plaintiff's rights as alleged herein through participation in a conspiracy to engineer his disciplinary process to exact the harshest punishment practicable against him while serving and protecting their illegitimate interests." Neither of the parties addresses this allegation in their briefs regarding the motion for summary judgment. Nonetheless, there does not appear to be a basis for this claim.

To establish a section 1983 conspiracy claim, a plaintiff must show "that persons acting under color of state law conspired to deprive him of a federally protected right." Ridgewood Bd. of Educ. v. N.E. Ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999). A plaintiff must also show a "combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events." Santucci v. Gross, No. 07-373, 2007 WL 2688650, at *5 (E.D. Pa. Sept. 10, 2007) (quoting Piskanin v. Hammer, 2005 WL 3071760, at *4 (E.D. Pa. Nov. 14, 2005)). "Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain other actions of the alleged conspirators taken to achieve that purpose will be deemed sufficient." Id. (quoting Piskanin, 2005 WL 3071760, at *4).

The plaintiff maintains all defendants acted together to engineer his disciplinary process to exact the harshest punishment practicable against him while serving and protecting their illegitimate interests. However, the plaintiff presents no evidence to establish an agreement between/among the defendants to deprive him of a constitutional right. Thereby, I will grant defendants' summary judgment motion for plaintiff's conspiracy claim.

been the target of sexual misconduct by three officers, including the plaintiff. (Doc. No. 48 at ¶¶ 15-17). While Gelvin contended that she found the conduct by the other two officers to be threatening, she indicated that she was not intimidated by the plaintiff's behavior because she did not take him seriously.[3]

This launched an additional investigation of the plaintiff and the two other officers, Trooper Alan Deffibaugh and Sergeant David Copley.[4] A Disciplinary Action Report (DAR) was issue for the plaintiff stating that he had violated department policy and regulation. (Doc. Nos. 43 and 48 at ¶ 30). These findings were based on mobile data communications, which included sexually explicit messages. Additionally, the findings were based on several inappropriate acts committed by the plaintiff, including an incident where the plaintiff glued pictures of male genitals on Ms. Gelvin's calendar art. (Doc. No. 43 at ¶ 33). A disciplinary action was instituted against the plaintiff, which included a thirty-five day suspension and a one-year transfer to Chambersburg. (Doc. No. 48 at ¶¶ 20, 47-48).

Furthermore, findings during the initial investigation of the other officers also resulted in a third investigation into the appropriateness of Ms. Gelvin's own behavior on other occasions. (Doc. No. 48 at ¶¶ 12-14). As a result, she was suspended for two days

---

[3] The plaintiff and Gelvin were friends prior to her employment with the State Police. (Doc. No. 48 at ¶¶ 7-8). Thereby, the plaintiff indicates that there was no basis for the sexual harassment claims against him because Gelvin did not find his conduct harassing. He also points to two incidents to show that Gelvin was not threatened by him or his behavior: 1) Gelvin allegedly took her shirt off in front of the plaintiff to show him bruises from a horse bite, and 2) she peed on the side of the road during an accident while the plaintiff looked on. (Doc. No. 48 at ¶¶32-33).

[4] Deffibaugh and Copley were later terminated as a result of these sexual harassment claims, which were found to have merit. (Doc. No. 43 at ¶¶ 49-50).

for having forwarded to a female clerk an inappropriate message that had been sent to her by one of the other male officers.

After working with Gelvin for six months after his investigation, the plaintiff was transferred temporarily to Troop H Huntingdon and was told to have no contact with the people at the McConnelsburg station. (Doc. No. 48 at ¶¶ 19, 22-23, 47-48). Less than two years after his transfer to the Chambersburg station, the plaintiff requested a transfer to the central turnpike with a preference for the Bedford County, Everett station. However, he was initially transferred to the Bowmansville station and then later to the Everett station. (Doc. No. 48 and 43 at ¶¶ 69-72). As a result, the plaintiff was forced to commute a significant distance from his home. Because of these transfers and the allegedly discriminatory penalties, the plaintiff brought the current case. He opposes this motion for summary judgment.[5]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

---

[5] It is unclear what material facts the plaintiff disputes. The plaintiff denies several of the material facts set forth by the defendants; however, his reasons for denial are either argumentative or conclusory without offering evidence or facts to contradict or rebut the facts set forth.

4

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the

quantity of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

Section 1983 imposes civil liability upon a person who, acting under color of state law, deprives another person of any rights, privileges or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000). "To state a claim under § 1983, a plaintiff must show that the defendant, through conduct sanctioned under the color of state law, deprived her of a federal constitutional or statutory right." Gruenke, 225 F.3d at 298 (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907 (3d Cir.1997)).

Section 1983 does not abrogate the States' Eleventh Amendment immunity. See Quern v. Jordan, 440 U.S. 332, 340-46 (1979); 4 Hurst v. City of Rehoboth Beach, 288 Fed. Appx. 20, 25 (3d Cir. 2008) (noting "[a]lthough Congress can abrogate a state's sovereign immunity, it did not do so through the enactment of 42 U.S.C. § 1983"). In addition to the United States Supreme Court's holding that a state is not a person, the Court expanded its ruling in Will v. Michigan Dept. of State Police, holding that state agencies and officials acting in their official capacity are not "persons" either.[6] 491 U.S. 58, 70-71 (1989).

---

[6] Although the complaint does not specify that the court consider the defendants in their individual and official capacity, I will infer that this is the case. Further, because the parties agree that, in their official capacity, the defendants are protected by Sovereign Immunity, I will grant the motion for summary judgment as to those claims. See Doc. No. 44 at 11-12; Doc . No. 52 at 4.

6

In order to impose individual supervisory liability under Section 1983, "there must be some affirmative conduct by the supervisor that played a role in the discrimination." Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990). The affirmative conduct can be shown through "allegations of personal direction or of actual knowledge and acquiescence or through proof of direct discrimination by the supervisor." Id. (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)); see also Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997) overruled in part on other grounds by Burlington N. & Sante Fe. Ry. Co. v. White, 548 U.S. 53 (2006). Any allegations concerning the "existence of an order or acquiescence leading to discrimination must be pled and proven with appropriate specificity." Andrews, 895 F.2d at 1478.

### A. Equal Protection

In order to prevail on a Section 1983 equal protection claim, the plaintiff must show that he was "subjected to purposeful discrimination" in this case because of his sex. Robinson, 120 F.3d at 1293. This purposeful discrimination "implies more than intent as volition or intent as awareness of consequences." Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 279 (1979). "It implies that the decisionmaker... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Id. at 279 (footnote and citation omitted)); see also Commonwealth of Pennsylvania v. Flaherty, 983 F.2d 1267, 1273 (3d Cir. 1993)(quoting Personnel Administrator of Mass., 442 U.S. at 279); McCleskey v. Kemp, 481 U.S. 279, 292 (1987).

To support his disparate treatment claim, the plaintiff alleges that he and his co-worker—Ms. Gelvin, a woman—engaged in the same inappropriate behavior. However, the plaintiff received a thirty-five day suspension without pay and was transferred, while the Ms. Gelvin only received a two-day suspension. See Kagarise Dep. at 126. The plaintiff offers no direct evidence that gender was a motivating factor for the difference in treatment and, instead, relies on the circumstances of the two disciplinary decisions as evidence of intent.

Even when a discrimination case is brought based on indirect evidence, a showing of purposeful intent is still required.[7] Flaherty, 983 F.2d at 1273 ("It is now well established that a *prima facie* showing of discriminatory intent may be proven indirectly, without a "smoking gun," on the "totality of the relevant facts," including disparate impact *if* coupled with some other indicia of purposeful discrimination.")(emphasis in original). See also Horner v. Kentucky High Sch. Athletic Ass'n, 43 F.3d 265, 276 (6th Cir. 1994)(finding that disparate impact alone did not establish a Fourteenth Amendment gender discrimination claim).

In finding discriminatory purpose, the court may consider various forms of evidence as part of "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 266 (1977). Patterns of disparate impact that are "significant, stark,

---

[7] Though the plaintiff does not assert a Title VII claim or a wrongful suspension claim, it is worth noting that "intent is a *prima facie* element of any Constitution-based civil rights claims of discrimination, and thus the Supreme Court distinguished the constitutional standard for discrimination from the standard promulgated under Title VII" on this issue. Epps v. City of Pittsburgh, 33 F.Supp.2d 409, 414 (W.D. Pa. Dec. 7, 1998) (discussing Washington v. Davis, 426 U.S. 229, 238-39 (1976)). This intent standard originated in racial discrimination cases; however, it has been extended to gender discrimination cases. See, e.g., Personnel Administrator of Mass., 442 U.S. at 273.

and unexplainable on other grounds" are sufficient to prove insidious intent. Id. at 264–68. In addition, evidence from the administrative history of a decision or departures from normal procedure may offer evidence of improper purpose, especially if the sequence of events raises some level of suspicion. Id. at 267-70.

Hence, in order to justify judicial intervention, the plaintiff has the burden of proving that the defendants' disciplinary decision was *purposefully* discriminatory related to his gender. The plaintiff has failed to establish this discriminatory intent.

The internal complaint indicated that the plaintiff "sent inappropriate MDC transmission to Trooper Stacy L. Gelvin, spoke inappropriately to her and others, and were involved in practical jokes of sexually harassing nature." See Doc. No. 45, Ex. 1, at 44. The plaintiff was reprimanded for violating the sexual harassment policy and inappropriately using police computers and cell phone for the transmission of several sexually suggestive messages.[8] Watson Dep. at 43. In addition to sending inappropriate texts and emails, the plaintiff also engaged in other inappropriate acts including his taking a check from Gelvin's checkbook, photocopying it, and writing himself a fake check for

---

[8] The plaintiff reiterates over and over in his pleadings that: "Plaintiff and Gelvin were consenting adults in their private communications, and they were never objected to between them, nor did they spill over and offend anyone. It was by all measures a loose atmosphere, and they engaged in the exact same behavior as between each other, and there is absolutely no rational difference in their treatment." Plaintiff's Answer to Defendants' Statement of Material Facts, Doc. No. 48, ¶¶ 18, 19, 20, 22, 23, 30, 31, 32-33, 41, 47-48, 49. While this statement may be appropriate to defend a sexual harassment charge in the first instance, it does little to show that the plaintiff's gender was the motivating factor in his differential treatment after the fact. Since the plaintiff does not plead a wrongful suspension claim, whether the underlying reasons for his suspension were warranted or accurate is not for this court to decide.

Furthermore, the plaintiff grieved his suspension and ultimately went to arbitration on the matter. The arbitrator found that the State Police had just cause to discipline the plaintiff and denied the grievance. See Defendants' Statement of Material Facts, Doc. No. 43, ¶ 66; Plaintiff's Answer to the Statement of Material Facts, Doc. No. 48, ¶ 66 (admitting this fact).

$1000 with the memo indicating it was for sex.[9] The defendants also found that the plaintiff's disciplinary action was warranted, in part, because the investigators believed he was not being cooperative or forthcoming with information during his interview.[10]

By comparison, his co-worker, Ms. Gelvin, was disciplined with only a two-day-suspension for sending a sexually suggestive email to another female clerk. See Gelvin Dep. at 23-25. The plaintiff indicates, however, that Gelvin engaged in other

---

[9] On or about December 13, 2004, the plaintiff took a check from Gelvin's checkbook, photocopied it, and filled out the photocopy of the check with "Date – 12/13/04, Pay to the Order of – Steven (A Good Lay) Kagarise, amount - $1,000.00, memo – For one hell of a good fuck, signed – Stacy L. Gelvin." Kagarise Dep. at 46-53 and attached Ex. 4.

The plaintiff was also disciplined for the following incidents:
- In 2005, the plaintiff sent a message to a vehicle occupied by Gelvin and another male officer on a midnight shift directing Gelvin to slowly reach over and unzip the male officer's pants, stroke his penis and put her mouth on it;
- On June 30, 2005, the plaintiff sent a message to Gelvin saying "listen bitch he said apartments;"
- On July 11, 2005, the plaintiff sent a message to Trooper Alan Deffibaugh that stated "why does Car 2 smell like sex or rotten crotch" after Deffibaugh and Gelvin had ridden together in Car 2;
- On July 11, 2005, the plaintiff sent to Gelvin a message saying "sounds good!!! I'm interested in learning. but I don't want to hear any bitching later when I'm in the middle of a riding session and someone wants to take a break or their to [sic] tired or sore to continue;"
- On August 24, 2005, the plaintiff sent a message to Gelvin calling her an "asshole;"
- On February 3, 2006, the plaintiff sent Gelvin a message using symbols to outline a face and male genitals with the genitals pointing to the mouth and the text "this is the only way to get tpr. or pco. of the year that I know of;" and
- The plaintiff wrote a note to Gelvin and signed with his initials saying: "I found this coat in the back of car two. I guess it's yours. It smells like it. It smells good by the way. I hope you don't mind I took it in the bathroom with me for awhile."

See Doc. No. 43 at 7-10; Kagarise Dep. 55-70 and attached exhibits; Gelvin Dep. at 31.

[10] During his interview, the defendants contend that the plaintiff claimed he did not recall sending many of the MDC messages, failed to answer all of the questions asked by Corporal Stchur, and received a note from his union representative that said "they don't have it," which led the investigator to believe that the plaintiff was not going to admit to anything unless he believed the investigators had proof. See Stchur Dep. at 24-26, 28-29; DAR attached to Kagarise Dep. as Ex. 3; Tucker Dep. at 20; Watson Dep. at 60-61. See also Patrick Dep. at 42; Tucker Dep. at 17-19. Furthermore, though the plaintiff admitted that the handwriting on the photocopied check appeared to be his, he could not recall whether he, in fact, copied and filled out the check. See DAR attached to Kagarise Dep. as Exhibit 3 pg. 3, Kagarise Dep. at 48-51. He also did not recall placing photos of male genitals on Gelvin's horse calendar because he "wrote on so many pictures." He said that he "did probably hundreds, hundreds of jokes and pictures and photocopies and stuff." "[O]ne guy has a book about two inches thick of writings and drawings and comments that I have made." Kagarise Dep. at 51-53.

inappropriate acts for which she was never disciplined.[11] Even viewing these facts in the light most favorable to the plaintiff—that Gelvin received more favorable treatment than the plaintiff—the plaintiff must demonstrate not only that he was treated differently from other individuals similarly situated *but also* that this disparate treatment was based upon his gender.[12] Andrews, 895 F.2d at 1478; Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992).

---

[11] The plaintiff contends that Gelvin sent several emails that were sexual in nature, which he claims were not a part of the investigation of her. However, he only points to one and is unclear about exactly what Gelvin had said: "She made a remark to me on the computer that so many words, I'd bet you like to ride a cowgirl, or this cowgirl or – you know, because she's always – she's into western stuff. I'd bet you'd like to ride this cowgirl or something in that statement." Kagarise Dep. at 161. He contends this email was never found during the investigation. He then simply indicates "he knows there was other things. I know she said stuff. But they didn't have it, so—" Id. The plaintiff never reported these incidents to the BRP and said he did not find them offensive. Id. at 161-62. The plaintiff also notes a time when Gelvin slapped his behind. However, he never reported this incident—which happened several years ago—either and he did not consider it to be harassment. Id. at 153.

In addition, the plaintiff contends that Gelvin had been untruthful as well and had perjured herself while testifying in N. Suders v. Baker. However, Gelvin was never charged with perjury nor convicted of perjury. District Attorney Harvey even reviewed the court transcript and found that Gelvin did not commit perjury and, thereby, did not bring charges against her. See Kagarise Dep. at 146-47, 154-155; Harvey Dep. at 51; Christie Dep. at 27-29; Watson Dep. at 22-23, 28.

Furthermore, there were allegations that Ms. Gelvin was having affairs with other officers. See, e.g., Watson Dep. at 57. One allegation was found to have merit. The male officer involved—Ellis Barnett—was suspended for not reporting instances of sexual harassment that Gelvin had told him as part of their intimate relationship; Gelvin received a written reprimand. Id. at 19-20. Their relationship itself was not found to have violated police procedures, especially since no inappropriate communications over the computer were found between them in violation of the Enterprise Network Agreement. Id. at 44. The investigation of this affair did find that Mr. Barnett had been preparing reports on Gelvin's behalf. However, Gelvin only received a written reprimand for this behavior in light of the circumstances. The Department found that this behavior was tied to Gelvin trying to avoid contact with her supervisor Mr. Copley, who was later found to have been sexually harassing her. Id. at 50-52.

It is worth noting that the plaintiff, in his deposition, stated that he does not actually know why Ms. Gelvin was reprimanded: "I don't know what the two days were for. I wasn't – I didn't get that once it was all the investigation was all said and done. I don't get her copy of the – her reprimand or what she received. But everything in total what all she did was just two days off." Kagarise Dep. at 155. The plaintiff was not involved in the investigation nor did he have first-hand knowledge of this information. Id. at 127. Instead, he stated that he heard what he knew from Gelvin herself. Id. at 130-31, 152.

[12] While there may be some genuine dispute as to this issue, I do not believe it warrants the case to proceed to trial because there appears to be no legal basis for a finding of a constitutional gender discrimination claim, as explained above. As mentioned previously, a sheer §1983 gender discrimination claim—what the plaintiff pled—requires more than Title VII or wrongful suspension claims in terms of intent. Thereby, the lack of this legal element would not change the outcome as to this dispute.

Nowhere in the pleadings is there evidence to show that the plaintiff's differential treatment was based on his sex.[13] In fact, the plaintiff himself even admits that he does not know why he was disciplined differently.[14] Furthermore, the plaintiff points to no pattern of differential treatment based on gender that would substantiate his claim.[15] There was also no showing that there was a deviation in procedure.[16]

Given that the plaintiff has not established a *prima facie* element of his Equal Protection claim, I will grant the defendants' motion for summary judgment as to this claim.[17]

---

[13] Plaintiff's counsel also indicates that he believes Gelvin is "fairly manipulative." Watson Dep. at 45. This insinuation also undercuts the contention that the plaintiff and Gelvin were treated differently simply because they were of different genders and not because they were simply different people.

[14] In his deposition, the plaintiff indicated that his discipline was the result of some ill-will held against him by Lisa Christie, who determined the amount of his disciplinary sanction. He stated: "Christie was after me. Christie is after me…So I think Christie is after me for some reason. Why? I don't know." Kagarise Dep. at 132.

[15] To the contrary, officers involved in the decision to suspend the plaintiff indicate that sexual harassment of either gender is possible. See Christie Dep. at 54-55; Stchur Dep. at 40.

[16] In a typical IAD, an investigator creates a report, the lieutenant corrects it, and then the captain reviews it. After that, the report is sent to the commanding officer and an area commander reviews it for concurrence. Then it is sent to the Department of Discipline's Office. Stchur Dep. at 66- 67. In this case, the plaintiff was interviewed by Corporals Stchur and Tucker, with a union representative also present. Corporal Stchur's report was then sent to Lieutenant Patrick to be corrected. Captain Oliphant then had an opportunity to review it. Major Watson then held a pre-disciplinary conference with the plaintiff and Trooper Pat McCormack, the plaintiff's union representative. As a result of the investigation, a Disciplinary Action Report (DAR) was issued for the plaintiff finding that the plaintiff had violated Department policy and regulations. This report was forwarded to Lisa Christie, the director of the Department of Discipline Office. Ms. Christie reviewed the investigation de novo and made a recommendation for court martial. This recommendation was then sent to Lieutenant Colonel John "Rick" Brown, Deputy Commissioner of Administration and Professional Responsibility, for concurrence before the plaintiff's official sanction was issued. Watson Dep. at 34; see also Stchur Dep. at 68.

The plaintiff contends that the defendants should have investigated further into Gelvin's behavior—beyond the investigations already undertaken—and that such a lack of diligence was a deviation from typical procedure. However, the evidence does not indicate this to be true. See Christie Dep. at 73-75.

[17] The plaintiff asserts that the defendants in their motion for summary judgment misconstrue this claim as a "class of one" claim under Willowbrook v. Olech, 528 U.S. 562 (2000). Although the claim was murkily pled at best, the plaintiff did plead a disparate treatment claim based on gender. Yet, he failed to offer any support for gender as being the motivating factor for his discipline. For this reason, it is understandable why the defendants responded to his claim as a "class of one." Though the plaintiff asserts this is not a class of one claim, even giving the plaintiff the benefit that his pleading could support a class-of-one claim, this claim would still fail. See Enguist v. Oregon Dep't

### B. First Amendment Retaliation

In addition to his gender discrimination, the plaintiff also alleges that his suspension was in retaliation for his previously voicing opposition to the quota system and conduct of other troopers. To establish a retaliation claim for engaging in activity protected under the First Amendment, a public employee must establish: 1) he engaged in a protected activity; and 2) the protected activity was a substantial factor in the alleged retaliatory action. Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005). "[T]he employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct." Hill, 411 F.3d at 125 (citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1997)).

To engage in protected speech, an employee must be speaking "as a citizen on a matter of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). If the employee is speaking as a citizen on a matter of public concern, it must be determined "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id. "[S]peech addresses a matter of public concern when it relates to an issue of 'political, social, or other concern to the community.'" McGreevy v. Stroup, 413 F.3d 359, 365 (3d Cir. 2005) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their

---

of Agriculture, 128 S. Ct. 2146, 2136 (2008)(explaining how "[t]he class-of-one theory of equal protection has no application in the public employment context") .

13

communications from employer discipline." Foraker v. Chaffinch, 501 F.3d 231, 239 (3d Cir. 2007) (quoting Garcetti, 547 U.S. at 421). Whether speech addresses a matter of public concern is determined by the "content, form, and context of a given statement, as revealed by the whole record." Hill, 455 F.3d at 242 (quoting Rankin v. McPherson, 483 U.S. 378, 384 (1987)). "[W]hether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." Foraker, 501 F.3d at 240.

In Foraker, state troopers reported corruption and unsafe conditions to their superiors. The United States Court of Appeals for the Third Circuit found this speech was not protected. Foraker, 501 F.3d at 243. The court reasoned that reporting problems at the firing range was among the tasks the plaintiffs were paid to perform. Their positions required they report up the chain of command and environmental concerns were within the scope of their routine operations because they used and maintained the equipment. Id. at 241-42.

The plaintiff claims that the disciplinary action he received was in retaliation for two instances which occurred during the course of his employment. The first was because he spoke out about the "stat sheet" that Captain Holmburg was using to keep track of officer's statistical information concerning the number of citations they issued. Doc. No. 48 at ¶¶ 73-74. Holmburg would use these statistics as a form of discipline and make the officers with lower stats write letters to their supervisors. Doc. 48 at ¶¶ 73-74. This is one example of the "quota" systems, which were against PSTA regulations. The plaintiff reported these practices to the PSTA and was very vocal about the wrongfulness

14

of them. Doc. No. 48 at ¶¶ 75-76. He also spoke out about quota systems that a supervisor, Richard Bosch, attempted to implement. Doc. No.52 at 9. The plaintiff alleges that this particular supervisor was directly involved is his relocation.

The second incident the plaintiff states was the cause of retaliation occurred when he reported his supervisor, Corporal Greg Edgin, for sexual harassment of a female officer. Doc. No.52 at 9. This incident led to Corporal Edgin's termination. Within the next year, the plaintiff faced his discipline arising from the Gelvin incident. Doc. No.48 at ¶ 4.

I will grant defendants' motion for summary judgment for the plaintiff's First Amendment retaliation claim. The plaintiff fails to identify a genuine issue of material fact concerning whether he was speaking as a citizen on a matter of public concern. His statements were made to a supervisor during work hours and concerned unwritten customs and policies about the implementation of quotas. Compl. at ¶ 15. These statements related to his duties as a Trooper, not matters concerning the community, politics, or any other social concern. "[W]hile the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" Garcetti, 547 U.S. at 420 (quoting Connick, 461 U.S. at 154). With regards to his reporting sexual harassment, the plaintiff's job duties included conducting law enforcement duties, which would include reporting sexual harassment in the workplace.

Furthermore, even if the plaintiff's speech were protected, he fails to show a causal link between these incidents and the violations for which he was disciplined. The

15

plaintiff's speech actions occurred at least a year prior to the claim against the plaintiff, some as long ago as the early 90's. Additionally, Major Christie—the officer who determined the plaintiff's disciplinary sanction—testified in her deposition that she was unaware of the quota system complaints made by the plaintiff. Christie Dep. at 50-51.

## IV. CONCLUSION

For these reasons, I will grant defendants' motion for summary judgment. An appropriate Order follows.